**FILED**

DEC - 4 2013

Clerk, U.S. District and Bankruptcy Courts

# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH ) <br> ) <br> OF THE PREMISES AT ) <br> ) <br> ) <br> 3066 Stanton Road, S.E., Apt. 106 ) <br> Washington, D.C. ) <br> ) <br> ) | Case: 1:13-mj-00876 <br> Assigned To : Magistrate Judge John M. Facciola <br> Assign. Date : 12/04/2013 <br> Description: Search and Seizure Warrant |

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

### INTRODUCTION

I, Detective Steven Schwalm, Metropolitan Police Department, Badge DII-1362, has been a sworn member of the Metropolitan Police Department since 1998. I have investigated various crimes enforced by the District of Columbia and United States' code for over fifteen years. I have arrested individuals for prostitution related offenses including pandering and human trafficking offenses in cases that have led to successful criminal prosecutions. I have acquired experience in investigating prostitution, pandering, procuring, and the sex trafficking of adults and juveniles through instructional classes sponsored by the Federal Bureau of Investigations and through hundreds of investigations involving prostitution and human trafficking. I have received training through the MPD Institute of Police Science. The training provided by the MPD trained your affiant in investigating and enforcing the laws of the District of Columbia Code. Through my training and experiences I have learned the following:

   a. The women that work for pimps are referred to as prostitutes, street walkers, hos, or call girls. Some of the prostitutes are not residents of the District of Columbia or the metropolitan area. The prostitutes are transported to the area from other states. The pimps isolate the prostitutes to control and monitor their activity.

   b. Pimps acquire money through the sexual exploitation of prostitutes. Pimps recruit young women that have poor self-esteem, low levels of education and come from dysfunctional families. Pimps

    provide and facilitate the essentials to sustain life for the prostitutes that are under their control. Pimps provide food, clothing and shelter for the prostitutes that are under his control.

c. Pimps who recruit young women use psychological manipulation and physical violence to force the females to participate in sexual favors for money, referred to as tricks or dates. The sexual acts include vaginal intercourse commonly referred to as a lay, oral sex commonly referred to as head or blow job, anal sex referred to as Greek, and manual masturbation, commonly referred to as a hand job.

d. Prostitutes who succumb to the pressure imposed by a pimp become a part of the pimp's stable. The stable is defined as a group of prostitutes that function under the direction of the pimp. Pimps designate one of the prostitutes to be his eyes and ears on the street to function as the second in command of his criminal enterprise so that the pimp can work under the cloak of anonymity. The prostitute that has this title is known as the "Bottom Bitch".

e. Pimps and their prostitutes often meet and become acquainted on the Track. The Track is the streets where prostitutes walk and solicit dates. In major cities it is commonly referred to as the red light district. Pimps walk and drive along the Track to recruit new prostitutes, referred to as sweating a bitch. Moreover, Pimps monitor the activity of the Stable from their vehicles.

f. Pimps manipulate the prostitutes into believing that they are taking possession of their personal property for safe keeping. Conversely, the Pimp is keeping the property so that the subordinate prostitute will follow his orders and return with the proceeds of the sexual favors.

g. Pimps commonly monitor their prostitutes during work with constant telephonic communication. They typically use cellular telephones as the primary means of communicating with the prostitutes who work for them. Prostitutes also keep in constant contact, via phones such as cellular phones, with other women also working for the same pimp. Prostitutes, when stopped by the police, are instructed by the pimp or the supervisory prostitute (known as the "bottom") to call the pimp and notify him that she has been stopped. Additionally, pimps often use their phones for text messaging to their prostitutes. All modern cell phones contain call management features such as the "call log" for tracking call histories and the electronic phone book for storing names and phone numbers. Pimps and prostitutes use the electronic phone book (aka "Address book" or "Contacts") function to store the telephone numbers of prostitutes, other pimps, and customers.

h. Pimps have found an additional way to find customers for their prostitutes. Pimps have found use of the internet as a way of advertising their stable. There are several web sites that are used to advertise prostitution. Some examples of these websites are Craigslist.com, Backpage.com, Cityvibe.com, and many other sites that are known to customers' who engage in the solicitation of prostitution. Pimps use computers, cell phones, tablets and other electronic devices to access the internet and post advertisements online.

i. Pimps have been known to carry weapons to protect themselves and their stable from being robbed or assaulted while conducting the illegitimate business of prostitution on the track. These weapons include but are not limited to swords concealed inside walking sticks or canes, straight razors, and firearms.

2

j. Pimps and traffickers often have indicia of prostitution related activities in their residences including, but not limited to, large amounts of condoms, lubricant, sex toys, photographs and other "souvenirs" related to prostitution, debit and gifts cards, cell phones, business cards.

3. Your affiant respectfully submits this affidavit in support of an application for a warrant to search the entire premises known as 3066 Stanton Road, S.E., Apt. 106, Washington, D.C. (hereinafter "PREMISES"), as described further in Attachment A. For the reasons set forth in the affidavit, there is probable cause to believe that instrumentalities, fruits, and evidence of violations of 18 U.S.C. §§ 2251(a) & 2252(a)(4) (production and possession of child pornography) and 18 U.S.C. § 1591(a)(2) (sex trafficking of a minor) are located within these premises. I am requesting authority to search the entire premises, including the residential dwelling and any computer and computer media, including external storage devices, and any indicia of prostitution or prostitution related activity including, but not limited to logs, business cards, and photographs, located therein where the items specified in Attachment B may be found, and to seize all items listed in Attachment B as instrumentalities, fruits, and evidence of crime.

4. The statements in this affidavit are based in part on my investigation of this matter, information relayed to me by other law enforcement officers, and the expertise of other law enforcement officers also familiar with child sexual exploitation investigations and cases. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of the violations of 18 U.S.C. §§ 2251(a), 2252(a)(4) (production and possession of child pornography), and 18 U.S.C. § 1591(a)(2) (sex trafficking of a minor) are presently located at the premises.

3

## STATUTORY AUTHORITY

5. This investigation concerns alleged violation of 18 U.S.C. §§ 2251(a), 2252(a)(2) (production and possession of child pornography) and 18 U.S.C. § 1591(a)(2) (sex trafficking of a minor). As set forth below, the defendant attempted to induce a 16-year-old female into prostitution and took naked photographs of that child.

## THE INVESTIGATION

6. On December 3, 2013, officers with the Internal Affairs Bureau, hereinafter IAB, were asked to assist Youth Division officers in an investigation into the whereabouts of a 16-year-old juvenile female ("complainant") who had been reported missing by her family. When Youth Division learned that the target residence was the home of a Metropolitan Police Officer IAB was called. The investigation into the missing juvenile began approximately one week ago. On December 3, 2013, Agents from IAB and three officers from the MPD Youth Division went to the address. They got there at about 7:00 p.m. the evening of December 3, 2013.

7. When the group of IAB and Youth Division detectives got to the apartment 102 at this address, one or more of them knocked on the door repeatedly, after not getting an initial answer. They waited a short time and continued to knock, and eventually an adult male answered the door. The individual is known to the Metropolitan Police Department and is a Metropolitan Police Officer ("suspect").

8. The other officers and Agent Eames explained to the suspect that we were looking for a missing person, and the suspect agreed to let officers in the apartment. Almost as soon as

4

Agent Eames entered the apartment, he could smell the odor of burning marijuana. Agent Eames is a former vice and drug officer. Officers asked if there was anybody else in the residence and learned that two females were in the bedroom. Officers spoke with the females, and learned that one of them was the missing juvenile (the complainant). The complainant had an outstanding juvenile custody order from a judge of the D.C. Superior Court. A juvenile custody order is the equivalent of an arrest warrant, for a minor, and authorizes police to take a juvenile into custody. The complainant was born in 1997, and she is 16 years old. Agent Eames then applied for an emergency search warrant for the premises, and executed the emergency warrant on December 4, 2013 at approximately 2:13 a.m.

9. After the complainant and the other woman (identified as 18-years-old) had come into the main part of the apartment, the officers and Agent Eames spoke to the suspect and the two young women. The suspect told the officers that he resided in the apartment. The complainant was in possession of marijuana. That marijuana was seized. The complainant advised officers that there was additional marijuana in the bedroom where she was located when the officers arrived.

10. Additionally, the police were informed by the complainant that she had been at the location before.

11. The suspect is not related by blood or marriage or custody to either of the two females in the apartment.

12. While Agent Eames was applying for the emergency search warrant for narcotics, the complainant was interviewed by Sergeant Morani Hines at Youth Investigations Division. The complainant advised him that she met the suspect about two weeks ago. The complainant stated

that she had been to the premises on a couple of occasions. On one particular occasion the suspect provided the complainant with a cellular telephone. The suspect told the complainant that he had made a "date" for her with an unidentified older white male. The suspect advised the complainant that the "date" was for her to engage in sexual acts with the older white male, who would pay her eighty dollars. The complainant was to provide the suspect with twenty dollars after the completion of the "date."

13. Additionally, the complainant stated that the suspect took naked photographs of her with his Galaxy cellular phone. The suspect took photographs of the complainant fully nude wearing sparkly high heel shoes, which the suspect provided for the complainant. The suspect also told the complainant that he was going to take her to "Rainbow" to purchase clothing for her for the date. The suspect also arranged to pay to have the complainant's hair done for the date. Subsequent to taking the photos, the suspect advised the complainant that the potential "date" "liked her photos and wanted to have the "date" with her. The suspect told the complainant that her nickname for prostitution purposes was going to be "Juicy."

14. The complainant told police that she has met six other females in the apartment. The complainant said that those females talked to her about prostituting for the suspect and how much money they made prostituting for him. The other females told the complainant that the suspect had advertised them on Backpage.com, a website commonly used to post advertisements for prostitution. The ads are often posted with sexually explicit photographs.

15. Due to emergency search warrant only covering narcotics and Agent Eames not having knowledge of what was related about the prostitution aspect of the case, your affiant is requesting an additional search warrant for the target location for prostitution related evidence.

6

During the execution of the emergency search warrant members observed a white plastic container with a large number of condoms inside. An additional black plastic bag was found to also have a large number of condoms. Further a number of female high heeled shoes were also located in the residence. Additionally, officers saw a mirror with female names on it. Those names, according to the complainant, were the names of the other females who had engaged in prostitution.

16. During the course of the search of the residence for narcotics, officers discovered and seized a number of electronic devices. Those devices will be the subject of further search warrants and provide reason to believe that the defendant may possess more such devices inside the premises.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS AND OTHER ELECTRONIC DEVICES

17. Based on my training and experience, I know that computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime, and/or (2) the objects may have been used to collect and store information about crimes (in the form of electronic data).

18. Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware, software, documentation, passwords, and data security devices which are (1) instrumentalities, fruits, or evidence of crime; or (2) storage devices for information about crime. Based on my own experience and consultation with others who have been involved in the seizure and search of computers, cell phones and retrieval of data from computer systems, there are several reasons why computers, computer hardware, computer

software, computer passwords, and data security devices often must be seized to permit a later, more thorough search and analysis by qualified computer experts in a laboratory or other controlled environment:

    a. Computer storage devices, such as hard disks, can store the equivalent of hundreds of thousands of pages of information. Additionally, when an individual seeks to conceal information, the individual may delete, hide, mark for deletion, or store information in random order with deceptive file names. This may require searching authorities to conduct extensive searches, using a range of data analysis techniques, such as scanning areas of the devices' memory not allocated to listed files, or opening every file and scanning its contents briefly to determine whether it falls within the scope of the warrant. This review and sorting process can take days or weeks, depending on the volume of data stored, and cannot be accomplished during a search on site.

    b. Searching computer systems for criminal evidence is a highly technical process, requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. It is difficult to know before a search what type of hardware and software are present and therefore which experts will be required to analyze the subject system and its data. Data search protocols are exacting procedures designed to protect the integrity of the evidence and recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources and from destructive code imbedded in the system as a booby trap), a controlled environment is essential to its complete and accurate analysis.

    c. Peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to read the data on the system. It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence.

    d. In order to fully retrieve data from a computer system, the analyst needs computer storage devices, as well as the central processing unit (CPU). In cases like the instant one where the evidence consists partly of image files, the monitor and printer might also show the nature and quality of the graphic images that the system could produce. Further, the analyst needs system software and any applications software that may have been used to create the data (whether stored on hard drives or on external media), related instruction manuals, and data security devices for proper data retrieval.

## SEARCH METHODOLOGY TO BE EMPLOYED

19. The search procedure of electronic data contained in computer hardware, cameras, computer software, and/or memory storage devices including a cellular phone may include the following techniques (the following is a non-exclusive list, as other search procedures may be used):

    a. on-site triage of computer systems to determine what, if any, peripheral devices or digital storage units have been connected to such computer systems, as well as a preliminary scan of image files contained on such systems and digital storage devices to help identify any other relevant evidence or potential victims;

    b. examination of all of the data contained in such computer hardware, computer software, or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

    c. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

    d. surveying various file directories and the individual files they contain;

    e. opening files in order to determine their contents;

    f. scanning storage areas; performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas.

    g. performing any other data analysis technique that may be necessary to locate and retrieve the evidence.

## **CONCLUSION**

20. For the reasons set forth above, there is probable cause to believe that evidence of production and possession of child pornography will be located in the Premises, as is further described in Attachment A.

20.  Therefore, I respectfully request this Court to issue a warrant to search the PREMISES described in Attachment A to seize the evidence, fruits, and instrumentalities described in Attachment B of violations of 18 U.S.C. §§ 2251(a), 2252(a)(4) (production and possession of child pornography) and 18 U.S.C. § 1591(a)(2) (sex trafficking of a minor). Permission is expressly sought to seize any computer hardware, computer software, external storage devices, and any computer-related documentation located at the PREMISES and subsequently conduct an on-site and off-site forensic examination, as necessary, using whatever data analysis techniques are needed to seize the evidence, fruits, and instrumentalities listed in Attachment B.

_____
Steven Schwalm
Detective, Metropolitan Police Department
Child Exploitation Task Force

DEC -4 2013

Sworn and subscribed before me
this _____ day of December, 2013

_____
UNITED STATES MAGISTRATE JUDGE
JOHN M. FACCIOLA
U.S. MAGISTRATE JUDGE

11